No. 22-1773

# In the United States Court of Appeals for the First Circuit

NADIA SHASH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED; AMJAD KHAN, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,
PLAINTIFFS-APPELLANTS

VICTOR D. MENASHE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, PLAINTIFF

*v.*

BIOGEN INC.; MICHEL VOUNATSOS; ALFRED W. SANDROCK, JR.;
SAMANTHA BUDD HAEBERLEIN, DEFENDANTS-APPELLEES

JEFFREY D. CAPELLO; MICHAEL R. MCDONNELL,
DEFENDANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS (CIV. NO. 21-10479)
(THE HONORABLE INDIRA TALWANI, J.)*

## BRIEF OF DEFENDANTS-APPELLEES

WILLIAM J. TRACH
LATHAM & WATKINS LLP
  *200 Clarendon Street
  Boston, MA 02116*

AUDRA J. SOLOWAY
DANIEL S. SINNREICH
DANIELLE J. MARRYSHOW
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
  *1285 Avenue of the Americas
  New York, NY 10019
  (212) 373-3000*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Biogen Inc. states that it has no parent corporation, and no publicly held company owns 10% or more of Biogen's stock.

# TABLE OF CONTENTS

Introduction ........................................................................................1

Statement of the issues ......................................................................5

Statement of the case .........................................................................5

Summary of argument .....................................................................16

Standard of review ...........................................................................20

Argument ..........................................................................................20

I.     This court should decline to take judicial notice of plaintiffs' post-class period documents .......................................................20

II.    The district court correctly held that plaintiffs failed to allege materially misleading statements or omissions ...........................22

    A.    The statements concerning the efficacy of high-dose aducanumab were not misleading ..........................................24

    B.    The statements concerning the correlation between plaque reduction and clinical outcomes were not misleading ...................................................................35

    C.    The district court did not create any 'clinical trial' exception for securities cases .................................................38

III.   The district court correctly held that plaintiffs failed to allege a strong inference of scienter .........................................41

IV.    Plaintiffs do not plead loss causation ............................................53

Conclusion .......................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abramson* v. *Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) ................................................................40

*ACA Financial Guaranty Corp.* v. *Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2017) ...........................................................42, 44

*Alaska Electrical Pension Fund* v. *Pharmacia Corp.*,
  554 F.3d 342 (3d Cir. 2009) ................................................................46

*Aldridge* v. *A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .................................................................52

*In re Ariad Pharmaceuticals, Inc. Securities Litigation*,
  842 F.3d 744 (1st Cir. 2016) .................................................32, 39, 47

*Arkansas Public Employees Retirement System* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022).............................................21

*United States* v. *Bello*,
  194 F.3d 18 (1st Cir. 1999) .................................................................21

*In re Biogen Inc. Securities Litigation*,
  193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) ...............................................................................................45, 53

*Brennan* v. *Zafgen, Inc.*,
  853 F.3d 606 (2017) ...........................................................................53

*Bricklayers and Trowel Trades International Pension Fund* v. *Credit Suisse Securities (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014) .................................................................54

*City of Dearborn Heights Act 345 Police & Retirement System* v. *Align Technology, Inc.*, 856 F.3d 605 (9th Cir. 2017).................................23

*City of Edinburgh Council* v. *Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) ........................................................27, 38

*Corban* v. *Sarepta Therapeutics, Inc.*,
    Civ. No. 14-10201, 2015 WL 1505693 (D. Mass. Mar. 31, 2015),
    *aff'd*, 868 F.3d 31 (1st Cir. 2017)......................................................38

*Cox* v. *Blackberry Ltd.*,
    660 Fed. Appx. 23 (2d Cir. 2016) ......................................................51

*Dahhan* v. *OvaScience, Inc.*,
    321 F. Supp. 3d 247 (D. Mass. 2018)................................................49

*In re Delcath Systems, Inc. Securities Litigation*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)..................................................40

*In re Ebix, Inc. Securities Litigation*,
    898 F. Supp. 2d 1325 (N.D. Ga. 2012) .............................................49

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    563 U.S. 804 (2011)...........................................................................56

*Frater* v. *Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) ...............................................41

*Greenspan* v. *Random House, Inc.*,
    No. 12-1594, 2012 WL 5188792 (1st Cir. Oct. 16, 2012) ................21

*Khoja* v. *Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)............................................................41

*Kleinman* v. *Elan Corp., PLC*,
    706 F.3d 145 (2d Cir. 2013) .............................................................46

*Local No. 8 IBEW Retirement Plan and Trust* v. *Vertex*
    *Pharmaceuticals, Inc.*, 838 F.3d 76 (1st Cir. 2016) ......................45

*Lorelei Corp.* v. *County of Guadalupe*,
    940 F.2d 717 (1st Cir. 1991) ............................................................21

*Lormand* v. *US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009)............................................................55

*Louisiana School Employees' Retirement System* v. *Ernst & Young LLP*, 622 F.3d 471 (6th Cir. 2010) ........................................50

*Lucia* v. *Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir. 1994) ........................................32

*Maldonado* v. *Fontanes*, 568 F.3d 263 (1st Cir. 2009) ........................................20

*Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27 (2011)................................................31, 39, 47

*Mehta* v. *Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020) ........................................43

*In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, Civ. Nos. 05-1151, 05-2367, 2015 WL 2250472 (D.N.J. May 13, 2015)........................................47

*Metzler Asset Management GmbH* v. *Kingsley*, 928 F.3d 151 (1st Cir. 2017) ........................................42

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) ........................................*passim*

*In re OSI Pharmaceuticals, Inc. Securities Litigation*, Civ. No. 04-cv-5505, 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ........................................34

*Ponsa-Rabell* v. *Santander Securities LLC*, 35 F.4th 26 (1st Cir. 2022)........................................20

*In re PTC Therapeutics, Inc. Securities Litigation*, Civ. No. 16-1124, 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ........................................34

*In re Riegel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869 (9th Cir. 2012)........................................26, 31, 48

*San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996) ........................................44

*Schueneman* v. *Arena Pharmaceuticals, Inc.*,
  840 F.3d 698 (9th Cir. 2016)..............................................................39, 47

*SEB Investment Management AB* v. *Endo International, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ..............................................40

*Singer* v. *Reali*,
  883 F.3d 425 (4th Cir. 2018)..............................................................52

*In re St. Jude Medical, Inc. Securities Litigation*,
  836 F. Supp. 2d 878 (D. Minn. 2011) ..............................................49

*Thant* v. *Karyopharm Therapeutics, Inc.*,
  43 F.4th 214 (1st Cir. 2022)..............................................................31

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ....................................................*passim*

*United States ex rel. Winkelman* v. *CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016) ............................................................21

*In re Xcelera.com Securities Litigation*,
  430 F.3d 503 (1st Cir. 2005) ............................................................55

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................42

**Other Authorities**

Staffs of the H. Comm. on Oversight & Reform and H. Comm. on
  Energy & Commerce, *The High Price of Aduhelm's
  Approval: An Investigation into FDA's Atypical Review
  Process and Biogen's Aggressive Launch Plans* (Dec. 2022) ..21, 29, 51, 52

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Appellees respectfully request oral argument.  Given the number of issues Appellant has presented on appeal and the complexity of the federal securities laws, oral argument would assist the Court in resolving the appeal.

## INTRODUCTION

This securities case concerns aducanumab, Biogen's Alzheimer's drug, branded as ADUHELM™. Aducanumab is the first treatment approved by the Food and Drug Administration (FDA) directed at an underlying pathophysiology of Alzheimer's disease, and is on the market today. Plaintiffs are Biogen investors who allege that, before the FDA approved aducanumab under its accelerated approval pathway, Biogen misled shareholders about aducanumab's clinical trials. Biogen relied on this clinical trial data in seeking and obtaining regulatory approval for aducanumab.

Plaintiffs do not argue that Biogen misrepresented the trial data it reported to investors. Indeed, Plaintiffs do not dispute that Biogen transparently disclosed that two clinical trials were terminated after a futility analysis by an independent committee, and that Biogen subsequently analyzed the available clinical trial data and concluded that one trial succeeded but the other did not. Plaintiffs do not even dispute that the topline data supported Biogen's conclusion that patients who received sufficient exposure to high-dose aducanumab achieved a statistically significant reduction in harmful plaques in their brain *and* a statistically significant clinical benefit. Instead, plaintiffs adopt a statistical analysis prepared by a dissenting statistician within the FDA and

cite alternative analyses of subgroup data that purportedly undermine Biogen's interpretations. Plaintiffs contend that defendants' failure to disclose these analyses amounts to securities fraud.

The district court (Talwani, J.) correctly dismissed plaintiffs' securities fraud claims in a well-reasoned opinion for failure to plead (1) a material misstatement or omission, (2) scienter, or (3) loss causation. The district court correctly applied precedent from numerous circuit courts and held that the facts alleged in the complaint—including the FDA's endorsement of Biogen's conclusions over plaintiffs'—demonstrated that the interpretation of the trial results here reflected a genuine scientific debate that is not actionable under the securities laws. The court rejected plaintiffs' attempt to declare their post hoc analysis "superior" to defendants' analysis, explaining that defendants were transparent about the extent to which their opinions were based on a post-hoc analysis, and that defendants' interpretations were reasonably supported by the data. The district court also determined that plaintiffs failed to allege that any defendant did not believe their own opinions about the trial data, or that anyone had conveyed plaintiffs' interpretations of the data to any defendant or that any defendant credited the plaintiffs' interpretations over their own. Finally, the district court held that plaintiffs failed to allege facts connecting their losses to any earlier misstatement.

On appeal, plaintiffs try to overcome the district court's opinion by arguing that this case somehow raises unique issues or that the district court created new law. Those arguments do not withstand scrutiny.

With respect to misleading statements, plaintiffs argue that the district court adopted a "novel rule of immunity for clinical trials." But the district court did no such thing. It merely held that defendants' data interpretations in this case are opinions—a point that plaintiffs *do not contest*—and applied substantial precedent holding that plaintiffs cannot establish fraud by arguing that their alternative interpretation of the trial data is better. Plaintiffs also ignore that, when defendants discussed their post hoc analysis, defendants' challenged statements focused on topline results of that analysis, not plaintiffs' alternative subgroup interpretation. Plaintiffs repeatedly focus on a portion of a statement by Defendant Sandrock referencing "all" the data but ignore the full statement, which never purported to be based on every possible interpretation of the data and was not misleading. And although plaintiffs accuse defendants of "p-hacking," this attack merely criticizes Biogen's decision to engage in a post hoc analysis of trial data to analyze evidence of efficacy—a decision that Biogen transparently communicated to investors and undertook with the FDA's endorsement.

Plaintiffs' arguments about scienter fare no better. Plaintiffs do not dispute their failure to plead a single fact about the knowledge or intent of any

defendant.  Plaintiffs do not plead that the speakers of the challenged statements were aware of plaintiffs' alternative data interpretations and were persuaded by them.  Nor do plaintiffs identify any motive for defendants to commit fraud, or address substantial case law rejecting the theory that a company would continue to invest in a therapy that it believes does not work.  And although plaintiffs rely heavily on alleged irregularities in the FDA's approval process—even though many of the alleged relevant events postdate the class period and are contained in documents that improperly go beyond the appellate record—these are criticisms of the FDA's process, not Biogen's conduct, and are irrelevant to the alleged fraud.

With respect to loss causation, plaintiffs acknowledge that Biogen's share price sharply *increased* on the day that the alleged "truth" (the analysis by the dissenting FDA statistician) was revealed.  Plaintiffs inappropriately seek to recover investment losses from a share-price decline several days later following an intervening event—a vote by an independent advisory committee on several questions regarding the efficacy of aducanumab.  But the only new information revealed by that vote was the outcome of the vote itself, and that information did not contravene any challenged statement (especially given that defendants made no statement predicting the advisory committee vote) and cannot establish loss causation.

This Court should affirm the district court's judgment on each of these three grounds—any one of which is sufficient to support dismissal.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that plaintiffs failed to allege that defendants' opinions expressing their interpretations of clinical data were materially false or misleading.

2.    Whether the district court correctly held that plaintiffs failed to plead facts giving rise to a strong inference of scienter.

3.    Whether the district court correctly held that plaintiffs failed to plead loss causation.

## STATEMENT OF THE CASE

### A.    Background

Alzheimer's disease is a neurodegenerative disorder affecting more than 6 million Americans in which the "brain cells that process, store and retrieve information degenerate and die." A67 ¶ 52; *see* A401. The leading theory concerning Alzheimer's disease, the amyloid hypothesis, suggests that reducing or removing certain proteins from the brain, called amyloid beta proteins, could be beneficial for patients with Alzheimer's disease. A67-68 ¶¶ 54-57, A317. In 2011, Biogen submitted an application to the FDA for investigation of a new therapy called aducanumab, which was designed to treat Alzheimer's by targeting harmful aggregated amyloid beta. A69 ¶ 61, A70 ¶ 66.

### 1.    *Clinical Trials Of Aducanumab*

The clinical trials of aducanumab followed a standard sequence.  In 2012, Biogen conducted a study called Study 103 or the PRIME Phase 1b Study. A70 ¶¶ 68-69.  The primary purpose, as evaluated by the "endpoints" of the study, was to evaluate aducanumab's safety.  A71 ¶ 75.  In addition to establishing safety, the PRIME Phase 1b Study showed a "statistically significant" reduction in amyloid beta aggregates in the brain for patients who received a 10 mg/kg dosage.  A330, A391-392; *see* A72 ¶ 76.  The Phase 1b Study also showed a corresponding reduction in patients' clinical decline.  *See* A112 ¶ 199.

In 2015, Biogen commenced aducanumab's Phase III clinical trials, designed to evaluate aducanumab's safety and efficacy using prespecified endpoints.  A72 ¶ 77, A332.  The Phase III trial was conducted as two independent but identically designed studies—Study 301 (ENGAGE) and Study 302 (EMERGE)—that started about one month apart, with Study 301 beginning first and remaining ahead in enrollment throughout.  A72 ¶ 81.  By design, approximately two-thirds of the patient population in both studies carried a gene called ApoE4.  A57 ¶ 10, A72 ¶ 79.  Carriers have an increased risk for developing a negative side effect called Amyloid Related Imaging Abnormalities (ARIA).  A57 ¶ 10.

Biogen initially restricted carriers to low doses of aducanumab.  A75 ¶¶ 91-93.  Over the life of the Phase III trial, however, the dosing protocols were

6

amended twice, increasing the dosage available to carriers each time. A76-77 ¶¶ 92-100. And after the second amendment, the target dose for carriers in the high-dose regimen was increased from 6 mg/kg to 10 mg/kg. A77 ¶¶ 99-100. Because enrollment in Study 302 began later and was slower than enrollment in Study 301, more patients in Study 302 received the full dose for a longer period of time. A90 ¶ 149.

The Phase III trials were not fully completed. Pursuant to a preestablished protocol, an independent committee conducted an interim "futility analysis" of data pooled from both Studies 301 and 302 in December 2018, once half of the enrolled patients had reached week 78 of the trial. A77 ¶ 103, A338-339. In March 2019, the independent committee concluded that continuing the trials would be futile and recommended termination of the study. A77-78 ¶¶ 105, 107; A339. On March 21, 2019, Biogen publicly announced the discontinuation of the Phase III trials based on the independent committee's futility analysis. A78 ¶ 108.

### 2. *Biogen's Analysis Of The Phase 3 Data And Its Discussions With The FDA*

Additional Phase 3 data was generated between the December 26, 2018, futility analysis cutoff date and the March 21, 2019, termination of the Phase III trials—meaning that months of blinded data were not available and had not been studied by either Biogen or the independent committee at the time that futility was declared. A81 ¶ 118, A340-341.

7

Biogen and its scientific team subsequently conducted an analysis of the Phase III trial data to learn as much as possible about how aducanumab worked.  A104 ¶ 181, A136 ¶¶ 267-268, A368, A406-408.  In doing so, Biogen reviewed three additional months of data that were generated after the futility dataset closed (between December 2018 and March 2019).  A81 ¶ 118, A340-341.  Biogen also analyzed Study 301 and Study 302 independently.  A339-341.  Based on its analysis, Biogen determined that Study 302 met its primary and secondary endpoints, but Study 301 did not.[1]  *See* A340-341, A368.[2]

Biogen also concluded based on further analyses that, although Study 301 had not met its primary or secondary endpoints, "the subset of patients who received sufficient exposure to 10 milligram per kilogram aducanumab . . . showed similar results to the comparable population from [Study 302], in terms of both amyloid plaque reduction and reduced clinical decline."  A102-103 ¶ 177.  Neither of these findings—namely, that Study 302 met its endpoints

---

[1] The studies' primary endpoint "was the change in CDR-SB scores, a measure of cognitive and functional decline, after 18 months."  A56 ¶ 4.  CDR-SB stands for "Clinical Dementia Rating-Sum of Boxes," and is "a measure of both cognition and function and has been established as an appropriate measure in early symptomatic Alzheimer's disease."  A333-334.

[2] At a June 2019 meeting, the FDA's Office of Neuroscience told Biogen that the futility analysis may have been flawed and that "it would have been more appropriate if futility had not been declared."  A84 ¶ 132.

and that the high-dose patients in Study 301 showed similar results to the comparable population in Study 302—are challenged by plaintiffs to be inaccurate.

Biogen shared its findings with the FDA and shareholders.  On October 22, 2019, Biogen announced that the "FDA indicated to [Biogen] that it is reasonable . . . to file these two studies" and that Biogen intended to seek approval of aducanumab.  A406, A425.

Over the following year, defendants provided updates on Biogen's ongoing analysis and explained their interpretations of the clinical trial data.  Defendants stated their scientific interpretation that Study 302 (EMERGE) had met its primary endpoint of a reduction in clinical decline, but that Study 301 (ENGAGE) had not.  A100 ¶ 171, A102-103 ¶ 177, A105 ¶ 185, A108-109 ¶ 191. Based on its post hoc analysis, Biogen also provided its scientific interpretation as to why Study 301 was a negative study; it opined that the differences in enrollment timing in the two Phase III trials, combined with the effect of the mid-study protocol amendments, resulted in fewer Study 301 participants than Study 302 participants receiving sufficient exposure to the 10 mg/kg dosage of aducanumab.  A366-367.  Biogen stated that the "primary learning from these data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints"—a finding that "was statistically significant in [Study 302]" and supported by "the data from patients who

achieved sufficient exposure to high dose aducanumab in [Study 301]."  A100 ¶ 171.

### 3. *The November 4, 2020, Publication Of The Joint Appendix And Massie's Dissenting View*

The FDA empaneled an advisory committee of independent scientists to assist in its review of Biogen's application.  A133-134 ¶ 259, A136 ¶ 272.  In advance of the advisory committee's meeting, Biogen and the FDA jointly prepared a briefing document, which the FDA published on November 4, 2020.  A135 ¶ 262; *see also* A305-398.  The joint report published not only Biogen's scientific conclusions, but also, for the first time, the FDA's positive views about the trial data, including that "the results of Study 302 [EMERGE] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab."  A361; *see* A136 ¶ 266.

The FDA simultaneously published an appendix prepared by Tristan Massie, an FDA statistician, who dissented from the FDA's position on Biogen's scientific conclusions.  Massie set forth several statistical counterarguments to Biogen's and the FDA's scientific interpretations and concluded: "In summary, the totality of the data does not seem to support the efficacy of the high dose."  A206.

Massie's dissenting opinion and analyses were public and unmistakable.  *See* A135 ¶ 262, A137 ¶ 273, A197-294.  The tenor of Massie's dissent also was

recognized in the market on the day it was published, as demonstrated by the various analyst reports cited in the complaint. A November 4, 2020, RBC report cited by plaintiffs, A139 ¶ 276(e), noted that the "FDA's statistician reviewer was *highly critical* and notes he sees '*no compelling substantial evidence* of treatment effect or disease slowing.'" A437 (emphasis added). Similarly, a Raymond James report cited by plaintiffs, A140 ¶ 277(b), observed that the Massie appendix was "very negative" and reflects a view that "*the entire analysis is flawed* and aducanumab doesn't work." A438 (emphasis added); *see also* A140-141 ¶ 277.

Biogen's stock price jumped on November 4, 2020. A141 ¶ 278. The complaint alleges that this increase was a reaction to the FDA's "effusive" comments regarding the trial data in the joint report. *Id.*; A135 ¶ 264.

### 4. *The Advisory Committee Meeting And Negative Votes*

On November 6, 2020, two days after publication of the joint report and the Massie appendix, the advisory committee published its votes on four questions, reflecting that a majority of Committee members did not view Study 302 as strong evidence of the effectiveness of aducanumab. A142-143 ¶¶ 280-281. On November 9, 2020, the first trading day following the advisory committee votes, Biogen's stock price declined. A145 ¶ 294. Shareholders filed putative class action lawsuits soon after the Advisory Committee vote—without awaiting the later FDA approval decision. A3.

5. *FDA Approval Of Aducanumab*

Several months later, in June 2021, the FDA approved aducanumab for the treatment of Alzheimer's disease through its accelerated approval program, based on the surrogate endpoint of reducing amyloid beta plaque in the brain—a hallmark of Alzheimer's disease.  A403.  According to the FDA: "In all studies in which it was evaluated,  .  .  .  Aduhelm consistently and very convincingly reduced the level of amyloid plaques in the brain in a dose- and time-dependent fashion.  It is expected that the reduction in amyloid plaque will result in a reduction in clinical decline [in Alzheimer's patients]."  A400.

**B.   Procedural History**

Plaintiffs purport to represent a class of investors who purchased Biogen stock between October 22, 2019, and November 6, 2020, and assert violations of Sections 10(b) and 20(a) of the Securities Exchange Act.  A51-294.

Specifically, plaintiffs challenge statements in which defendants opined that their post hoc analysis supported the conclusion that aducanumab was effective for patients who received sufficient exposure to a 10mg/kg dose.  *See* Add. 19-22.  Plaintiffs do not dispute that the topline data was accurately reported in the course of offering that opinion, but allege instead that defendants "concealed" alternative analyses among certain subgroups of patients that supposedly undermined defendants' interpretation of aducanumab's efficacy.

12

*See* Add. 23.  Plaintiffs also challenge statements in which defendants interpreted the data to show that high-dose aducanumab caused a reduction in amyloid plaque, which in turn led to positive clinical outcomes.  *See* Add. 27-29. Plaintiffs do not challenge that amyloid plaque was in fact reduced, but allege that any correlation with clinical outcomes was not "meaningful" based on results among various patient subgroups.  *See* Add. 30; A114 ¶ 206. Plaintiffs concede that, in both instances, a majority of reviewers within the FDA supported defendants' interpretation.  *See* Add. 25, 30.

On September 12, 2022, the district court granted defendants' motion to dismiss on three separate grounds, holding that plaintiffs had failed to plead any materially false or misleading statements, scienter, or loss causation.  *See* Add. 33, 38, 40.

*First*, the district court found that none of the challenged statements was materially false or misleading because the challenged statements were "interpretations of clinical trial data," which are "opinions."  Add. 17-18.  The court relied on precedent from "several circuits" holding that where, as here, plaintiffs raise "disagreements with the scientific conclusions drawn from those opinions," such disagreements "are not actionable."  *Id.*

The court explained that "[p]laintiffs do not dispute that the challenged statements accurately reported the results of Biogen's post hoc analyses and that the post hoc results support" Biogen's scientific conclusions.  Add. 23, 27;

*see* Add. 29 ("Biogen's conclusion . . . was transparently based on the topline results and reasonably supported by them"). Instead, plaintiffs allege that "an alternative post hoc analysis—focused on patient subgroups—produced results inconsistent with Biogen's topline conclusions." Add. 24. But as the district court noted, "nothing in the complaint establishes the primacy of the sub-group level analysis," and the facts alleged in the complaint—including the FDA's endorsement of *Biogen's* conclusions over plaintiffs'—"demonstrate[] that the proper statistical method for analyzing the topline results is one of genuine scientific debate and therefore not actionable under the PSLRA." Add. 24-25, *see* Add. 29-30. Biogen was "transparent" about the extent to which its conclusions were drawn from a post hoc analysis that used "alternative statistical analyses" to "look for evidence of efficacy to support FDA approval." Add. 24. And "where 'it is clear that a post hoc analysis is being used, it is understood that those results are less significant and should therefore have less impact on investors.'" Add. 23 (quoting *Kleinman* v. *Elan Corp., PLC*, 706 F.3d 145, 154 (2d Cir. 2013)). Additionally, the court held that Biogen had "no affirmative duty to disclose all information" about the clinical trials, and any omission of plaintiffs' alternative subgroup analysis "was not misleading given that Biogen expressed its conclusions as reasonable opinions." Add. 26-27.

*Second*, the district court found that plaintiffs had failed to plead a strong inference of scienter because the complaint contained no facts supporting "the conclusion that Biogen believed its own conclusions were wrong." Add. 34. Plaintiffs did not allege "that any [d]efendant viewed the topline results as incompatible with the sub-group analysis, or that anyone conveyed such skepticism to any [d]efendant." Add. 37. Plaintiffs cannot satisfy scienter "based solely on the inference that a defendant 'must have had' knowledge that an alternative or conflicting view existed." Add. 35 (quoting *Maldonado* v. *Dominguez*, 137 F.3d 1, 9-10 (1st Cir. 1998)). The court also noted that defendants' transparent disclosures to investors that Biogen was not releasing all data, including subgroup data, undercut any inference of scienter, and that no reasonable investor would interpret these disclosures "to mean the sub-group data supported Biogen's conclusions." Add. 36-37. The court also explained that the fact that "the FDA ha[d] endorsed the post hoc analysis and conclusions" is "strong evidence against finding scienter." Add. 38. Ultimately, the court "rejected the inference that a company would continue to invest in a therapy when it supposedly knows it does not work," Add. 37, and found the "more plausible inference [was] that Biogen—at FDA's suggestion and under its regulator's guidance—conducted the post hoc analysis and revealed its conclusions in a genuine attempt to obtain FDA approval to bring aducanumab to market," Add. 35.

*Third*, the district court concluded that plaintiffs had failed to plead loss causation because the complaint did not "sufficiently allege a corrective disclosure that connects" the negative news accompanying Biogen's stock drop to any "earlier false or misleading statement." Add. 39-40 (citation, internal quotation marks, and emphasis omitted).

This appeal followed.[3]

## SUMMARY OF ARGUMENT

The district court's judgment should be affirmed on several independent grounds.

I.    As a threshold point, plaintiffs improperly rely on several extra-record documents that postdate the class period and complaint. This Court should decline to take judicial notice of these documents for their truth. But even if the documents are considered, none supports plaintiffs' claims.

II.    Plaintiffs do not dispute that each challenged statement reflects the speaker's opinion interpreting the results of Biogen's analysis of clinical trial data. Plaintiffs' claims are therefore subject to the heightened pleading standard set forth in *Omnicare, Inc.* v. *Laborers District Council Construc-*

---

[3] The district court did not reach defendants' separate argument that neither plaintiff can establish reliance because both concededly purchased Biogen shares only *after* the joint report and Massie appendix were published. Add. 41. Defendants reserve all rights with respect to this argument.

*tion Industry Pension Fund*, 575 U.S. 175 (2015). Plaintiffs' theory—that defendants' opinions are misleading because of the alleged omission of plaintiffs' alternative statistical analysis—does not meet this standard. Indeed, the notion that disputes about proper interpretation of trial data give rise to a claim of securities fraud has been repeatedly rejected by courts of appeals.

A.     Defendants' opinions that the clinical trial data supported the conclusion that aducanumab was effective in patients who received a sufficiently high dose were not misleading. Plaintiffs do not dispute the accuracy of the data, or that Biogen's post hoc analyses supported this conclusion. Instead, plaintiffs argue that defendants failed to disclose alternative subgroup analyses, which purportedly support a different scientific interpretation. But disagreements about how to analyze clinical trial data are not actionable under the securities laws. That principle applies with particular force where, as here, a majority of FDA reviewers *agreed* with defendants' interpretation.

Biogen also never spoke about the patient subgroup data on which plaintiffs focus, and it had no affirmative duty to disclose plaintiffs' alternative analyses. Plaintiffs take a portion of a statement by an individual defendant out of context and argue that defendants made sweeping statements about "all" clinical trial data. But no reasonable investor would have understood any challenged statement as suggesting that there was no way to analyze the data that might support a different conclusion. Plaintiffs also repeatedly characterize

defendants' post hoc analysis of the clinical trial data as "p-hacking." But defendants were transparent with investors that the clinical trials were terminated after a futility analysis; that Biogen determined in analyses after the futility announcement that one of the clinical trials had failed; and that Biogen was engaging in a post hoc analysis (with the FDA's blessing) to look for evidence of efficacy. The transparent use of a post hoc analysis cannot constitute securities fraud.

B.    For similar reasons, Biogen's opinions about the link between a high dose of aducanumab and reduction in amyloid plaque were not misleading. Plaintiffs do not dispute the accuracy of Biogen's topline data showing that patients who received high-dose aducanumab demonstrated both statistically significant plaque reduction and clinical benefit. Plaintiffs focus on data among specific subgroups that defendants did not speak about and argue that it supports a different scientific conclusion. Such disagreements over interpretation do not render defendants' opinions false.

C.    In an effort to avoid their pleading failure, plaintiffs argue that the district court created a new clinical-trial exception to the securities laws. The district court did no such thing. It merely determined that the interpretations of clinical trial data at issue here are opinions—which plaintiffs do not contest—and applied well-settled precedent dismissing claims premised on scientific disagreement.

III.   The complaint fails to raise a strong inference of scienter because it does not allege that any individual defendants did not honestly believe any challenged opinion.  The complaint does not allege a single fact about the knowledge or intent of any defendant, much less that the speakers of the challenged statements were aware of plaintiffs' competing analyses and were persuaded by them.  Nor do plaintiffs attempt to identify any motive for any defendant to commit fraud, or explain *why* a company would continue to invest in a therapy that it believes does not work.  Further, in their public statements, defendants expressly declined to speculate on the FDA review process and likelihood of approval, which undermines any claim of an intent to defraud.

IV.   Plaintiffs also fail to plead loss causation.  Plaintiffs allege that publication of the Massie appendix on November 4, 2020, revealed the "truth" of defendants' "fraud."  But the stock price actually *rose* following its publication.  In search of a stock drop to justify this lawsuit, plaintiffs instead seek to recover losses that occurred several days later—after the advisory committee vote on November 6, 2020.  But the only new information revealed by that vote was that the advisory committee published its votes on four questions, reflecting that a majority of Committee members did not view Study 302 as strong evidence of the effectiveness of aducanumab.  That revelation did not correct any alleged misstatement or omission and cannot satisfy loss causation.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal of a securities fraud complaint for failure to state a claim under Rule 12(b)(6). *Ponsa-Rabell* v. *Santander Securities LLC*, 35 F.4th 26, 32 (1st Cir. 2022). "[C]omplaints alleging securities fraud," like this one, are subject to "a heightened pleading standard" under the PSLRA. *Id.* at 33. Plaintiffs "must also meet the Rule 9(b) standard for pleading fraud with particularity." *Id.* (citation omitted). "[T]he tenet that a court must accept as true the allegations contained in a complaint is inapplicable to legal conclusions," and "conclusory statements are not entitled to the assumption of truth." *Maldonado* v. *Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (citation and internal quotation marks omitted).

## ARGUMENT

### I. THIS COURT SHOULD DECLINE TO TAKE JUDICIAL NOTICE OF PLAINTIFFS' POST-CLASS PERIOD DOCUMENTS

Plaintiffs improperly rely on three documents that postdate the filing of the complaint. Br. 21-22 & n.1. This Court should reject plaintiffs' attempt to rely on these documents for their truth.

The first two documents are press releases from April and May 2022 concerning a Medicare and Medicaid coverage decision and changes in the Biogen organization that postdate the class period. The district court denied plaintiffs' request to take judicial notice of these post-class-period documents, Add. 13-15, and plaintiffs make no attempt to show that the district court

abused its discretion in doing so. *See United States* v. *Bello*, 194 F.3d 18, 23 (1st Cir. 1999).

The third document is a December 29, 2022, congressional staff report discussing the FDA's review process for aducanumab, issued while this appeal was pending.[4] "Documents . . . not presented to the district court" are "not properly part of the appellate record." *Lorelei Corp.* v. *County of Guadalupe*, 940 F.2d 717, 721 n.4 (1st Cir. 1991). Moreover, plaintiffs rely on this report (and the two press releases) exclusively for their *truth*. *See* Br. 38 n.3, 48-49 n.4, 50 n.5. This is improper. *See Greenspan* v. *Random House, Inc.*, No. 12-1594, 2012 WL 5188792, at *1 (1st Cir. Oct. 16, 2012); *see also Arkansas Public Employees Retirement System* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022). Plaintiffs' reliance on *United States ex rel. Winkelman* v. *CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016) is misplaced. Unlike here, in that case, the documents subject to judicial notice had been submitted to the district court without objection, and there was no discussion of whether they could be considered for their truth. *See id.* at 208.

Furthermore, these documents are irrelevant and unhelpful to the Court because they postdate the events at issue, and none provides insight into

---

[4] *See* Staffs of the H. Comm. on Oversight & Reform and H. Comm. on Energy & Commerce, *The High Price of Aduhelm's Approval: An Investigation into FDA's Atypical Review Process and Biogen's Aggressive Launch Plans* (Dec. 2022) ("House Staff Report").

whether the challenged statements were false or misleading when made, much less defendants' knowledge or intent during the class period.  *See* Add. 14-15.

## II. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO ALLEGE MATERIALLY MISLEADING STATEMENTS OR OMISSIONS

Plaintiffs challenge two categories of alleged misstatements on appeal: (1) statements concerning the efficacy of high-dose aducanumab and (2) statements concerning the correlation between plaque reduction and clinical outcomes.  *See* Br. 33-41.[5]

As a threshold point, the district court determined that the challenged statements are all opinions because they represent "interpretations of the clinical trial data" and "'express a view, not a certainty' about the meaning of the phase III data."  Add. 7, 18.  Plaintiffs do not challenge this determination as to any of the statements.  *See* Br. 35.  Accordingly, plaintiffs must meet the heightened pleading standard for opinion statements established by the Supreme Court in *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).

Under *Omnicare*, an expression of opinion is not actionable unless a plaintiff: (1) relies on a "material misrepresentation" theory and alleges "both

---

[5] Plaintiffs challenged additional categories of misstatements below, but do not appeal the aspects of the district court's opinion dismissing statements concerning the alleged correlation of Study 302's clinical endpoints, Add. 31, or demographics and characteristics of clinical trial patients, Add. 32-33.

that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue"; (2) relies on a theory that an embedded fact "within an opinion statement is materially misleading" and alleges "that 'the supporting fact [the speaker] supplied [is] untrue'"; or (3) relies on an omissions theory and alleges the omission of material facts that "make[] the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Retirement System* v. *Align Technology, Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (quoting *Omnicare*, 575 U.S. at 1327, 1332).

Plaintiffs make no attempt to satisfy the first two prongs of *Omnicare*. With respect to the first prong, plaintiffs plead no facts suggesting that any defendant did not honestly believe their scientific opinions regarding the clinical trial data. This is fatal to any claim under a material-misrepresentation theory. *See Omnicare*, 575 U.S. at 183-84. With respect to the second prong, plaintiffs do not allege that any challenged opinions contain false embedded facts. An "embedded fact" is a plain factual statement that supports an opinion statement. *Id.* at 185-86. Here, plaintiffs do not challenge the accuracy of any objective facts conveyed in defendants' statements.

Instead, plaintiffs pursue an *omissions* theory. Plaintiffs argue that both categories of challenged statements were misleading because they did not "disclose" that "other data" supported a different scientific conclusion. *See*

Br. 13-14.  But the Supreme Court has warned that pleading an omissions the-

ory under *Omnicare* "is no small task for an investor."  575 U.S. at 194.  A

plaintiff "must identify particular (and material) facts going to *the basis* for

the issuer's opinion  .  .  .  whose omission makes the opinion statement at

issue misleading to a reasonable person reading the statement fairly and in

context."  *Id.*  Plaintiffs identify no such facts.  Nor could they, as defendants

were transparent about the data they were releasing and the extent to which

opinions were based on a post hoc analysis.

To distract from this pleading failure, plaintiffs accuse the district court

of "adopt[ing] a novel rule of immunity for clinical trials."  Br. 30.  But as dis-

cussed in detail below, the district court did no such thing.  *Infra* pp. 38-41.

Instead, it applied substantial precedent holding that (1) interpretations of

clinical data are opinions and (2) disagreements with those interpretations are

nonactionable.  Add. 17 (citing cases); *see also, e.g.*, *Tongue* v. *Sanofi*, 816 F.3d

199, 214 (2d Cir. 2016).

## A.    The Statements Concerning The Efficacy Of High-Dose Aducanumab Were Not Misleading

Plaintiffs argue that defendants misled investors when they expressed

their opinion that aducanumab was effective for patients who received suffi-

cient exposure to a 10mg/kg dose based on defendants' review of clinical trial

data.  *See* Br. 33-39.  For example, plaintiffs allege that Defendant Sandrock

24

misled investors by offering his opinion that "[o]ur primary learning from these data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints," and that the "reduction in clinical decline was statistically significant in [Study 302], and we believe that patients . . . who achieved sufficient exposure to high dose aducanumab in [Study 301] support the findings of [Study 302]." *See* Br. 12-13; A100 ¶ 171. Sandrock also noted that "[a]fter consultation with the FDA, we believe the totality of these data support a regulatory finding." A100 ¶ 171. Defendant Budd Haeberlein offered a similar opinion: "I think what we have learned clearly is that dose is very important, but that if individuals do receive 10 milligrams per kilogram then they do have an efficacious response." A103 ¶ 179.

These opinions were based on, among other things, trial data showing that (1) a high dose of aducanumab in Study 302 resulted in a statistically significant clinical slowing of decline, A345, A360, and (2) even though study 301 failed to meet its endpoints, participants in Study 301 with sufficient exposure to 10 mg/kg dosing had clinical outcomes similar to those in Study 302. A388. And Biogen was transparent with investors about the extent to which these conclusions were based on a post hoc analysis. *See, e.g.*, A100 ¶ 171.

Plaintiffs do not dispute that Study 302 demonstrated a statistically significant benefit, and that Study 301 failed to meet its endpoints, but certain high-dose participants experienced better clinical outcomes similar to those in

Study 302.  Add. 23.  Instead, plaintiffs argue that defendants' opinions were misleading because they "concealed" two alternative analyses that considered subgroup level data and supposedly supported a different conclusion about aducanumab's efficacy.  Br. 34.  First, plaintiffs argue that they would have expected to see "better" clinical outcomes among the small subgroup of patients who (1) were carriers who (2) received a 10 mg/kg dose (3) in Study 302 (4) after the second protocol amendment.  Br. 34 (citing A92-93 ¶¶ 157-159). Second, plaintiffs acknowledge that high-dose patients performed better than patients on placebo in both Studies 301 and 302, but argue that they would have expected the subgroup of non-carriers to perform better than they did. Br. 34 (citing A91 ¶¶ 152-153).

These allegations come nowhere near meeting the standard for an actionable omission under *Omnicare*.  The allegedly concealed analyses (and the conclusions plaintiffs draw from them) are *opinions* about how best to interpret the data, not materially conflicting facts as required by *Omnicare*, and disagreements about how to analyze clinical trial data are not actionable under the securities laws.  *See In re Riegel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869, 878 (9th Cir. 2012) (falsity not pleaded where allegations "concern two different judgments" about the appropriate "statistical methodology adopted by the doctors and scientists who designed and conducted the

[drug] study"); *Tongue*, 816 F.3d at 214 ("[D]ispute[s] about the proper inter-
pretation of data" are protected expressions of opinion); *City of Edinburgh
Council* v. *Pfizer, Inc.*, 754 F.3d 159, 170-71 (3d Cir. 2014) (disagreements with
scientific conclusions drawn from "[i]nterpretations of clinical trial data" are
non-actionable).  And even if the competing interpretations were "facts"
known to each defendant (which plaintiffs do not plead), an opinion is "not nec-
essarily misleading when an issuer knows, but fails to disclose, some fact cut-
ting the other way," because "[r]easonable investors understand that opinions
sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189-
90; *see also Tongue*, 816 F.3d at 214.

Plaintiffs' theory that defendants' conclusions "did not 'fairly align[] with
the facts known to the speaker,'" Br. 35 (quoting *Carbonite*, 22 F.4th at 7), is
further undermined by the undisputed fact that the FDA *agreed* with defend-
ants' scientific conclusions that "[t]he effect of aducanumab in Study 302 is ro-
bust and exceptionally persuasive on several of the instruments used to eval-
uate efficacy"; and that Study 301 "do[es] not meaningfully detract from the
persuasiveness of Study 302" because "patients with higher exposure to the 10
mg/kg dose in Study 301 had similar responses to patients in Study 302." A398.
The FDA's agreement with defendants' scientific conclusions is evidence that
defendants had a reasonable basis for those conclusions.  *See Tongue*, 816 F.3d

at 214 (allegations that "Defendants' interpretations of the data [were] irrational or unreasonable . . . have little merit" following the FDA's acceptance after resubmission).

Plaintiffs insist that the "FDA never endorsed Biogen's analysis" because Dr. Massie is also "part of the FDA." Br. 37. But FDA endorsement does not require unanimity, and plaintiffs themselves allege that the *FDA found* "that [Study 302] was a positive study" and that "patients in Study 301 with adequate and consistent dosing should also demonstrate an effect on clinical endpoints," A136 ¶ 267, and described the *FDA's* views on the aducanumab data expressed in the joint report as "effusive," A135 ¶ 264. Furthermore, this argument misses the point. As the district court held, the FDA's endorsement of "Biogen's statistical model over the one Plaintiffs contend should supersede it here . . . demonstrates that the proper statistical method for analyzing the topline results is one of genuine scientific debate and therefore not actionable under the PSLRA." Add. 25.

Plaintiffs relegate the FDA's support to mere evidence of "regulatory capture." Br. 38. This accusation is not supported by any well-pleaded facts. The only action that plaintiffs allege *any defendant* took to accomplish this "regulatory capture" is a single purported "off-the-books" meeting. *See* A61 ¶ 21. Plaintiffs plead no facts about what was said in that meeting or why it

was improper.[6]  Plaintiffs never allege that Biogen influenced any FDA reviewer to change his or her scientific view of aducanumab's efficacy.  This is a critical omission, because individual FDA reviewers—reviewers plaintiffs do not allege had any reason to risk their credibility in service of approving aducanumab—reached conclusions about the data inconsistent with the interpretations plaintiffs ask the Court to adopt.  *See, e.g.*, A437, A526-527, A553-554; A525, A537-538; A540.[7]  The internal debate within the FDA, to the extent relevant at all, demonstrates only that there existed a genuine scientific debate over the interpretation of the data.

Plaintiffs raise several other arguments on appeal.  None is persuasive.

*First*, plaintiffs accuse Biogen of "p-hacking" the data to get a desired result based on a single allegation that "Biogen tasked 49 of its statisticians to pore over the Phase III results and salvage any data that could support aducanumab's approval."  A81 ¶ 118; *see* Br. 34-35.  But Biogen was fully trans-

---

[6] The extra-record congressional report plaintiffs rely on undermines their insinuation; the FDA's Office of Medical Policy found that there was "no evidence" that any interactions between Biogen and the FDA prior to the advisory committee meeting "were anything but appropriate in this situation." House Staff Report 10.

[7] For example, the FDA's primary clinical reviewer, Dr. Kevin Krudys, Ph.D., "question[ed] the robustness of" Dr. Massie's analyses because they focused on improper subsets of patient data.  A526-527.

parent that aducanumab's clinical trials had been terminated based on a futility analysis, and that Biogen undertook a post-futility analysis of the data, including a post hoc analysis of the data from the failed Study 301 trial, to look for evidence of efficacy.  Add. 23-24; *see* A100 ¶ 171, A102-103 ¶ 177, A105-106 ¶ 185, A108-109 ¶ 191.  As the district court correctly explained, plaintiffs' argument that defendants' statements did not "reflect 'the type of inquiry that a reasonable investor would expect,'" Br. 35 (quoting *Carbonite*, 22 F.4th at 7), "amounts to [p]laintiffs having a 'problem with using post hoc analysis as a methodology in pharmaceutical studies,' not with Biogen's specific methodology," Add. 24 (citations omitted).  But it is not "[the court's] job to evaluate the use of post hoc analysis generally," nor are "[d]efendants required to adopt (and disclose) [plaintiffs'] view of the data where [d]efendants' conclusions are reasonably supported by their own analyses."  Add. 30 (quoting *Kleinman*, 706 F.3d at 154-55).  Because shareholders were well aware that Biogen was performing a post-futility announcement and post hoc analysis, and the statements accurately disclosed Biogen's interpretation that aducanumab was effective for patients who received sufficient exposure to a 10mg/kg dose, they are not misleading.

Plaintiffs' argument that fraud can be inferred from the fact of post hoc analysis is also illogical.  Biogen had spent over ten years and millions of dollars researching and developing a potential therapy for treating Alzheimer's

disease.  Any reasonable investor would expect Biogen to "task" its statisti-
cians with "por[ing] over" the unblinded data to learn as much as possible and
"salvage" what they could.  *See* Br. 9, 44.  This is evidence of good corporate
governance and pursuit of scientific knowledge, not securities fraud.

 *Second*, plaintiffs argue without substantiation that the omissions were
"material."  Br. 34-35.  But the securities laws "do not create an affirmative
duty to disclose any and all material information."  *Matrixx Initiatives, Inc.*
v. *Siracusano*, 563 U.S. 27, 44 (2011).  And "to the extent that Plaintiff[s] sug-
gest[] that parties conducting clinical trials necessarily are required to release
all the detailed data or break that data down by categories that may plausibly
be of interest to some investors, Plaintiff[s] [are] incorrect."  *In re Riegel*
*Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869, 879 n.7 (9th Cir.
2012).  Rather, "a company must reveal only those facts that are needed so
that what was revealed would not be so incomplete as to mislead."  Add. 26-27
(citations omitted); *see Omnicare*, 575 U.S. at 194; *Thant* v. *Karyopharm*
*Therapeutics, Inc.*, 43 F.4th 214, 226 (1st Cir. 2022) ("Although investors may
have been interested in [certain clinical trial data], we have conclusively estab-
lished that a company is not, by virtue of making *some* disclosure about its
products, obligated to disclose *all* potentially interesting information." (em-
phasis in original)).  As discussed above, *see supra* pp. 24-29, plaintiffs have
not met this standard.

Plaintiffs' cases are distinguishable because they involved factual statements (not opinions) that were directly contradicted by concealed facts (not opinions). In *In re Ariad Pharmaceuticals, Inc. Securities Litigation*, 842 F.3d 744, 752-53 (1st Cir. 2016), the company asserted that pancreatitis was the "most prevalent" serious adverse event and noted "low rates of cardiovascular issues," when in fact the FDA had informed the company that serious cardiovascular issues were by far the most prevalent adverse event. And in *Lucia* v. *Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 176 (1st Cir. 1994), the funds at issue misled investors by telling them that junk bonds had outperformed Treasury bonds using a ten-year comparison while omitting that *the opposite was true* in the six years leading up to the public offering. The statements here, by contrast, are reasonable scientific interpretations of complex clinical data. Biogen was not obliged to disclose every possible interpretation of the clinical data to avoid liability for its opinions.

*Third*, plaintiffs argue that defendants were obligated to disclose Massie's competing subgroup analyses because Biogen "injected subgroup analysis into the dialogue" by "claiming that Study 301 failed because it had more patients enrolled before Biogen increased the doses for carriers." Br. 37. But plaintiffs are conflating Biogen's explanation for how the protocol amendments differently affected Study 301 and Study 302 with the separate issue of whether subgroup data was implicated in the alleged misstatements

about efficacy. None of the challenged statements, including the one cited in plaintiffs' brief (A100 ¶ 171), discusses results among "carriers" or any other "subgroups." *See* Add. 26.[8]

Plaintiffs attempt to obscure the contours of defendants' alleged misstatements by repeatedly pointing to a portion of Defendant Sandrock's statement in order to suggest that he claimed that "all of Biogen's data supported its explanation" about the efficacy of high-dose aducanumab. *See* Br. 36. But Sandrock's *actual* statement was that Study 301 was "a negative study" but that "portions of it do support the analysis that we did with [Study 302]," and that "consistent with the findings from [Study 301] and [Study 302], you really need to get to the higher dose. And I think our data [are] all consistent with that." A108-109 ¶ 191. Sandrock never claimed that every piece of data supported his conclusion, and he certainly did not mention *any* carrier-level subgroup analysis.[9] No reasonable investor would have understood Sandrock's

---

[8] In the cited statement, Sandrock explained to investors that "patients included in the futility analysis were those who had enrolled early in the trials and those early enrolling patients had a lower average exposure to aducanumab in large part due to two protocol amendments that occurred sometime after the start of the trials. . . . As a consequence, the larger dataset available after trial cessation included more patients with sufficient exposure to high dose aducanumab." A100 ¶ 171.

[9] Sandrock's full statement was as follows: "I think – look, the filing is based on these 3 studies, EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. We believe that data from ENGAGE – that portions of

statement to mean that there is *no* way to analyze the data that might support a different conclusion.

Plaintiffs rely on unreported district court cases from other circuits, but their cases are inapposite. In *In re PTC Therapeutics, Inc. Securities Litigation*, unlike here, defendants allegedly made objectively false statements about quantifiable metrics when they claimed that the "totality of the clinical data" showed that their drug was effective where nearly 60% of patients reported no meaningful benefit from the drug. *See* 2017 WL 3705801, at \*2-3, 5 (D.N.J. Aug. 28, 2017). And in *In re OSI Pharmaceuticals, Inc. Securities Litigation*, unlike here, the company chose to speak about specific subgroups, and then made false statements about subgroup data when it claimed that a lung cancer drug "improved survival in all subsets of patients including smokers," but in fact there was no survival benefit in two key subgroups, including smokers. *See* 2007 WL 9672541, at \*8 (E.D.N.Y. Mar. 31, 2007).

---

the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE. And then I'll say in also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as CDR sum of boxes. And again, very similar that the lower doses did not show much of an effect. So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that." A108-109 ¶ 191.

**B.      The Statements Concerning The Correlation Between Plaque Reduction And Clinical Outcomes Were Not Misleading**

Plaintiffs next allege that defendants misled investors when they interpreted the clinical trial results as showing that a high dose of aducanumab caused a reduction in amyloid plaque in patients' brains, and that the reduction correlated to positive clinical outcomes.  *See* A121-126 ¶¶ 221-232.  At the same time, plaintiffs concede that defendants made clear that they were "still learning" as they continued to analyze the data.  *See* A122 ¶ 223.

Plaintiffs do not dispute that Biogen's analyses showed that patients who received high-dose aducanumab both (1) achieved statistically significant reduction in amyloid plaque, Add. 27, and (2) achieved statistically significant reduction in clinical decline, *supra* pp. 25-26.  Moreover, plaintiffs themselves allege that there was a *positive correlation* across the clinical trials, as well as in both Studies 301 and 302 independently.  A121 ¶ 220; Add. 30.  Nonetheless, plaintiffs once again analyze the data differently and rely on results among various "subgroups"—particularly high-dose patients in Study 302—to argue that the *correlation* between amyloid reduction and positive clinical outcomes was not "meaningful."  A114-115 ¶¶ 206-208; *see* Br. 39.

This is just another example of plaintiffs forming a different scientific conclusion than defendants by focusing on a subset of trial data and ascribing it more weight.  As discussed above, and as the district court correctly held,

such disagreements do not render defendants' interpretations false.  *See supra* pp. 26-27; Add. 30.  Moreover, like Biogen's statements about the efficacy of high-dose aducanumab, *see supra* pp. 27-29, the "FDA ultimately *endorsed* Biogen's methodology and conclusions."  Add. 30.  Indeed, the FDA granted accelerated approval *specifically* because the "FDA has determined that there is substantial evidence that Aduhelm reduced amyloid beta plaques in the brain and that the reduction in these plaques is *reasonably likely to predict* important benefits to patients."  A401 (emphasis added).  And, once again, several independent reviewers within the FDA specifically criticized the statistical analysis on which plaintiffs now rely.  *See, e.g.*, A556-557; A589; A597.[10]  In these circumstances, defendants' opinions about plaque reduction and clinical efficacy were not misleading.  *See Tongue*, 816 F.3d at 214.

Plaintiffs vaguely argue that Biogen "secretly changed" its statistical analyses to measure correlation between plaque reduction and efficacy, and that "Biogen suppressed its own prespecified plan and used post hoc analysis without disclosing the change."  Br. 39-41.  But plaintiffs plead no facts supporting this theory.  Plaintiffs do not identify who was involved in this

---

[10] For example, Dr. Stein, an FDA reviewer, found that there were "limitations" to Dr. Massie's "patient-level correlation analysis," and that the "strong *group-level* relationship" between plaque reduction and clinical results supports the conclusion that "reduction in amyloid plaque . . . is reasonably likely to predict clinical benefit."  A556-557 (emphasis added).

"change" or when it occurred, A120-121 ¶¶ 215-220, much less that any *individual defendant* was aware of it or that it caused any defendant to *disbelieve* their opinions about the trial results. Plaintiffs' failure to tie this allegation to any speaker or challenged statement renders it meaningless. This allegation is also irrelevant because defendants did not quantify any correlation for investors, much less compare correlation data across different subgroups. Rather, the challenged statements "compare the performance of the treatment group against the placebo group without differentiating among high and low dose populations." Add. 28-29.

Plaintiffs also argue without substantiation that the omitted subgroup correlation data was "material." *See* Br. 40. As discussed above, however, materiality alone does not impose an affirmative duty to disclose. *See supra* p. 31. Nor was disclosure necessary to make any challenged opinion not misleading. *See supra* p. 35. Indeed, as the district court concluded, defendants' opinions "lacked the sufficient certainty to mislead" because Biogen stated that it was "still learning as [it] look[ed] at the data" and the statements were "opinions consisting of either optimistic responses to questions soliciting the speaker's perspective or educated speculation." Add. 28-29.

In the end, plaintiffs' objection boils down to a disagreement with the amyloid hypothesis itself. *See* Br. 40; *see also* A116 ¶ 210 (alleging that the

clinical trial data "show that the amyloid hypothesis *is not true*").  But the amyloid hypothesis is the leading theory behind Alzheimer's disease, and it has driven clinical research for *30 years*.  A67-68 ¶¶ 53-57.  While plaintiffs allege that this leading and longstanding scientific theory "is not true," their opinion does not render Biogen's competing opinion misleading.

### C.     The District Court Did Not Create Any 'Clinical Trial' Exception For Securities Cases

Plaintiffs argue that the district court "adopted a novel rule of immunity for clinical trials."  Br. 30.  The district court did no such thing.  Rather, it acknowledged that "[s]everal circuits have made explicit that [i]nterpretations of clinical trial data are considered opinions and that disagreements with the scientific conclusions drawn from those opinions are not actionable."  Add. 17 (internal quotation marks omitted) (citing cases).  That is indisputably the case, as the Second and Third Circuits have explicitly held.  *See Tongue*, 816 F.3d at 214; *City of Edinburgh Council*, 754 F.3d at 170; *see also Corban* v. *Sarepta Therapeutics, Inc.*, Civ. No. 14-10201, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017) (dismissing complaint where "the challenged statements consist of interpretations of the company's data, which constitute non-actionable expressions of opinion").  Plaintiffs make no attempt to distinguish this precedent, or *any* of the other cases upon which the district court relied on this point.

38

Nor did the district court create some unique rule for statements about clinical trial data. Factual statements about clinical trials are subject to the same standards as any other factual statements. *See, e.g.*, *Ariad*, 842 F.3d at 752-53. Here, plaintiffs point to no factual statement that they allege was erroneous. And *opinion* statements about clinical trials are subject to the *Omnicare* standard like all other opinion statements. *See supra* p. 23-24. But where, as here, plaintiffs' theory boils down to a "dispute about the proper interpretation of data," those opinion statements are inactionable under *Omnicare*. *See Tongue*, 816 F.3d at 213-14.

The cases on which plaintiffs rely are inapposite; none involves competing interpretations of clinical data.

*First,* plaintiffs rely on cases where defendants misrepresented material facts about adverse safety events. The court in *Schueneman* v. *Arena Pharmaceuticals, Inc.*, 840 F.3d 698, 708 (9th Cir. 2016) sustained a claim where defendants stated that "all the animal studies that have been completed" supported the FDA's approval when one such study showed that the drug caused cancer in rats. Similarly, in *Matrixx*, 563 U.S. at 45-47, the Supreme Court sustained a claim where the issuer told the market that "reports indicating that Zicam caused anosmia were 'completely unfounded and misleading'" but defendant had evidence of a link between the two, and "it had not conducted

any studies of its own to disprove that link." *See also supra* p. 32 (distinguishing *Ariad*). The defendants in those cases were alleged to have misrepresented or concealed *facts* that rendered their statements false or misleading. In contrast, plaintiffs here allege that defendants' *opinions* were misleading because defendants failed to disclose alternative *opinions*—ones that plaintiffs do not allege that any defendant was even aware of at the time the statements were made.

*Second*, plaintiffs rely on cases where, unlike here, defendants allegedly made false or misleading statements about quantifiable metrics. For example, in *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020), defendants told investors that the results of "*all* the major [American] studies" show that "resected pancreatic cancer patients live" no more than "20 months." *Id.* at 176 (emphasis added). In fact, half of the major studies identified in the complaint showed survival rates ranging from 25 to 43 months. *Id.* at 177; *see also SEB Investment Management AB* v. *Endo International, PLC*, 351 F. Supp. 3d 874, 898 (E.D. Pa. 2018) (factual statements that "abuse rates were reduced" were false because "in fact the intravenous abuse rate had increased"); *In re Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d 320 (S.D.N.Y. 2014) (factual statement that adverse safety events were "similar" between two groups was objectively false when mortality rate was far greater in one group); *see also supra* p. 34 (distinguishing *PTC Therapeutics*

and *OSI Pharmaceuticals*).  Here, Biogen did not mislead investors about specific data or the overall results of the studies.  To the contrary, Biogen repeatedly disclosed that Study 301 was a "negative study" that had not met its endpoints.

*Third*, plaintiffs rely on cases where, unlike here, defendants manipulated clinical trial data.  For example, in *Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), defendants claimed that positive interim results demonstrated that a weight-loss drug reduced cardiovascular events, but concealed updated results showing that there was no such cardiovascular benefit. *Id.* at 1015; *see also Frater* v. *Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 346 (E.D. Pa. 2014) (challenged statements were "the product of statistically unsound analyses of empirically defective trials").  Here, by contrast, Biogen fully disclosed that it would be conducting a post hoc analysis of data from a failed study, and plaintiffs "do not dispute that the challenged statements accurately reported the results of Biogen's post hoc analyses."  Add. 23.

The district court's application of well-settled precedent thus did not create a "novel rule of immunity for clinical trials."

## III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO ALLEGE A STRONG INFERENCE OF SCIENTER

To state a securities-fraud claim, the complaint "must state with *particularity* facts giving rise to a *strong inference* that the defendant acted with"

scienter.  *Metzler Asset Management GmbH* v. *Kingsley*, 928 F.3d 151, 158 (1st Cir. 2017) (emphasis in original); 15 U.S.C. § 78u-4(b)(2)(A).  Plaintiffs must show that "a reasonable person would  .  .  .  deem" their theory of scienter "cogent and at least as compelling as any opposing inference one could draw." *Kingsley*, 928 F.3d at 158 (citation and internal quotation marks omitted).  This "rigorous" test requires a showing of "intentional or willful conduct designed to deceive or defraud investors" or "a high degree of recklessness." *Id.*  The First Circuit's application of this rule "is notably strict and rigorous." *ACA Financial Guaranty Corp.* v. *Advest, Inc.*, 512 F.3d 46, 58 n.7 (1st Cir. 2017) (internal quotation marks and citation omitted).  Plaintiffs do not come close to meeting this strict standard.

The challenged statements in this case were made by the individual defendants: Vounatsos, Sandrock, and Budd Haeberlein.  Plaintiffs' theory is that these individuals, who were among Biogen's senior management, intentionally misled investors when expressing their opinions about the results of aducanumab's clinical trials.  Remarkably, however, plaintiffs do not allege that any individual defendant did not honestly believe any challenged statement.  As the district court explained: "missing from the allegations is any contention that any [d]efendants viewed the topline results as incompatible with the sub-group analysis, or that anyone conveyed such skepticism to any [d]efendant." Add. 37.  Indeed, the complaint does not plead a *single fact* about

the knowledge or intent of *any* individual defendant. There are no allegations describing when these three individuals purportedly learned information contradicting their stated opinions, how they had such knowledge, or whether they *believed* the purportedly omitted analyses and *disbelieved* their public statements. Nor are there "allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements" the individual defendants were "aware that they were withholding vital information or at least were warned by others that this was so"—facts this Court has determined are the hallmarks of a well-pleaded theory of scienter. *Mehta* v. *Ocular Therapeutix, Inc.*, 955 F.3d 194, 206-07 (1st Cir. 2020).

Plaintiffs' assumption that someone must have presented a conflicting view to the individual defendants—much less that the individual defendants *endorsed* the conflicting view—is not sufficient. Even under an omissions theory, Rule 9(b) and the PSLRA require well-pleaded facts. As the district court correctly reasoned, "[p]laintiffs cannot allege intent to deceive shareholders based solely on the inference that a defendant 'must have had' knowledge that an alternative or conflicting view existed." Add. 35 (quoting *Maldonado* v. *Dominguez*, 137 F.3d 1, 9-10 (1st Cir. 1998)).

Plaintiffs also offer no theory as to *why* defendants would pursue approval of a therapy in which they lacked confidence, particularly where Biogen discontinued clinical trials following an independent futility analysis. As the

district court explained, "courts have repeatedly rejected the inference that a company would continue to invest in a therapy when it supposedly knows it does not work." Add. 37 (citing *Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020), and *Cozzarelli* v. *Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 627 (4th Cir. 2008)). Indeed, defendants expressly *declined* to speculate about the FDA review process and cautioned that approval was not guaranteed—conduct that is fundamentally inconsistent with an intent to defraud. *See, e.g.*, A651; *infra* p. 56.

There are also no allegations that any defendant sold stock at inflated prices during the class period or otherwise received any pecuniary gain, which weighs against a finding of scienter. *See Advest*, 512 F.3d at 66-67 (finding no inference of scienter in part due to absence of allegations that any defendant would be "personally enrich[ed]"); *San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) (finding no inference of scienter where most defendants "did not sell their shares during the relevant class period").

To the contrary, the corporate defendant (Biogen) spent nearly *$10 billion* repurchasing tens of millions of shares during the class period at prices it allegedly knew were inflated. *See* A709. This negates any inference of scienter, since "[i]t would make little sense for defendants to initiate a repurchase program if they knew Biogen's stock price was artificially inflated by their

fraudulent misrepresentations." *See In re Biogen Inc. Securities Litigation*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017).

Absent any well-pleaded facts, plaintiffs raise various scienter arguments based on circumstantial allegations and speculation. None withstands scrutiny.

*First*, plaintiffs argue that Biogen "resorted to p-hacking" after its "pre-specified plan failed," and that Biogen's "willingness to manipulate statistical data" supports an inference of scienter. Br. 43-44. For the reasons discussed above, plaintiffs' threadbare allegations about "p-hacking" and Biogen supposedly "changing its plan" are not supported by well-pleaded facts or connected to senior management or any individual defendant in any way. *See supra* pp. 29-30, 36-37. These allegations thus cannot satisfy the particularity requirement of the PSLRA. *See Local No. 8 IBEW Retirement Plan and Trust* v. *Vertex Pharmaceuticals, Inc.*, 838 F.3d 76, 81 (1st Cir. 2016).

Further, there can be no inference of scienter where Biogen disclosed to the market that it was engaging in post-futility-announcement and post hoc analyses to determine whether there was any useful data that could be gleaned. *See, e.g.*, A111 ¶ 195; *supra* pp. 29-30. While plaintiffs argue that the FDA's regulations "require[] analysis plans to be specified in advance," Br. 44, they ignore that the FDA has also provided guidance on post hoc analyses, and that courts *explicitly reject* theories that "simply ha[ve] a problem with using

45

post hoc analysis as a methodology in pharmaceutical studies" so long as "it is clear that a post hoc analysis is being used." *Kleinman*, 706 F.3d at 154. As the district court noted, "Biogen was transparent that the goal of the post hoc analyses was to look for evidence of efficacy to support FDA approval and Biogen further disclosed that its post hoc analyses were aimed at using alternative statistical analyses to identify different, non-specified, indicators of effectiveness." Add. 24. Plaintiffs do not dispute these disclosures, which evince no intent to mislead investors about the basis of defendants' opinions.

None of plaintiffs' cases is to the contrary. In *Alaska Electrical Pension Fund* v. *Pharmacia Corp.*, 554 F.3d 342, 344-45 (3d Cir. 2009), the defendants engaged in "a bad faith misrepresentation of scientific data" and "distort[ed]" the results of a clinical study by secretly releasing results from only the first six months of a study and concealing that the *complete* study was a failure. Here, Biogen disclosed that it would be conducting a post hoc statistical analysis of a failed study—with the FDA's blessing—and was clear about the data it relied on in forming its opinions. In *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, 2015 WL 2250472, at *22 (D.N.J. May 13, 2015), the court denied summary judgment based on evidence that an individual defendant personally changed a clinical endpoint after being "cautioned"

about doing so by a senior company scientist.  In contrast, there are no allegations in the complaint that any individual defendant believed, or was informed, that the post hoc analysis was inappropriate.[11]

*Second*, plaintiffs argue that Biogen's decision not to release *all* the Phase III clinical trial data gives rise to an inference of scienter.  Br. 45-47.  Plaintiffs posit, therefore, that scienter can be inferred when a pharmaceutical company declines to release *all* clinical data for a drug under the FDA's review.  This argument is both illogical and unsupported by law.  Companies are not obligated to disclose "all" clinical trial data so that investors (and competitors) can perform their own statistical analyses.  *Supra* p. 31.  Thus, the district court correctly held that "Biogen is not obligated to disclose the data and investors may interpret this decision themselves."  Add. 36.  Further, "[b]ecause Biogen's own analysis of the data is not fully discredited by sub-

---

[11] Plaintiffs' other cases are distinguishable because they included well-pleaded facts giving rise to the inference that defendants knew that their statements were misleading.  In *Matrixx*, the company "issued a press release suggesting that studies had confirmed that Zicam [did] not cause anosmia" when a panel of scientists it had assembled informed the company that the scientific evidence was "insufficient."  563 U.S. at 49.  In *Ariad*, defendants expressed optimism about the chances of FDA approval with a "favorable label" weeks after the FDA had rejected the company's proposed label.  842 F.3d at 753.  And in *Schueneman*, despite making a statement that "all the animal studies" supported their conclusion, there was "no question that  . . .  Defendants knew that the [unfavorable] Rat Study existed" and that "the animal studies were *the* sticking point with the FDA."  840 F.3d at 707-08.

group data presented in the Massie report, Biogen's decision not to release the raw phase III data does not create an inference of scienter." Add. 36 (citing *Carbonite*, 22 F.4th at 10).

Plaintiffs argue that Biogen's decision not to release "all" trial data represented a change in practice, based principally on Defendant Sandrock's statement that "typically, we do present a lot of things, subgroups included, in the past." A164 ¶ 346. But as the district court acknowledged, Sandrock provided "a plausible explanation for withholding the information from the public: that the data was under review by the FDA." Add. 36; *see also* A164 ¶ 346. Defendants were clear with investors about what data they were and were not releasing. A164-165 ¶ 346. This transparency undermines any inference of an intent to defraud. For example, in *Riegel*, the Ninth Circuit held that the failure to disclose "all safety results" was not actionable when the company told investors it would disclose only "key safety results," despite investors' desire for "more extensive information." 697 F.3d at 880-81. Plaintiffs also cast Sandrock's statement that Biogen had "nothing to hide" in a sinister light, but plead no facts to support the inference that this statement is probative of scienter. *See* A164 ¶ 346.

Plaintiffs' assortment of district-court cases do not stand for the broad proposition that a change in practice supports an inference of scienter. Unlike here, in those cases the change went wholly unexplained to the market. And

48

each case involved substantial additional allegations of scienter that are absent here. *See Dahhan* v. *OvaScience, Inc.*, 321 F. Supp. 3d 247, 256 (D. Mass. 2018) (company's failure to investigate missing sales goal gives rise to inference that "Defendants either knowingly misrepresented the reason or recklessly failed to investigate the reason"); *In re Ebix, Inc. Securities Litigation*, 898 F. Supp. 2d 1325, 1346-1347 (N.D. Ga. 2012) (various company personnel warned superiors—including at least one individual defendant—that statements were unsupported); *In re St. Jude Medical, Inc. Securities Litigation*, 836 F. Supp. 2d 878, 899 (D. Minn. 2011) (same).

*Third*, plaintiffs argue that scienter can somehow be inferred based on alleged irregularities in the FDA's approval process. *See* Br. 47-48. But plaintiffs' allegations are centered on the *FDA's* alleged conduct, not Biogen's. The FDA decided to issue joint briefing materials with Biogen. *See* A135 ¶ 265. The FDA submitted purportedly "leading questions" to the advisory committee. *See* A136-137 ¶ 272. And the FDA ultimately decided to grant accelerated approval. *See* A154 ¶ 315. These allegations have nothing to do with defendants' beliefs and state of mind during the class period, and they shed no light on whether defendants honestly held their scientific opinions about the clinical trial data or on whether any defendant "either knew or recklessly disregard[ed] the falsity of [their] statements *at the time the statements were*

made." *Louisiana School Employees' Retirement System* v. *Ernst & Young LLP*, 622 F.3d 471, 484-85 (6th Cir. 2010) (emphasis added).

The *only* factual allegation describing any conduct by an individual defendant is plaintiffs' assertion that Sandrock had a "secret, off-the-books" meeting before the class period even started with FDA employee Dr. Dunn. A61 ¶ 21. But plaintiffs identify nothing prohibiting such a meeting and fail to explain what was discussed at the alleged meeting, much less how it is relevant. Plaintiffs do not allege that Sandrock did not honestly believe in the strength of the clinical trial data. And although plaintiffs (impermissibly, *see supra* pp. 20-22) rely on an extra-record congressional report, the report does not support any inference of scienter. That the FDA and Biogen had a significant amount of correspondence during the approval process is not probative of whether Biogen had any intent to deceive investors. Indeed, that same congressional report noted that an internal review by the FDA concluded that there was "no evidence" that any of these interactions "were anything but appropriate." House Staff Report at 10.[12] And while the congressional report suggests that Massie's team was not invited to collaborate on aspects of the joint briefing materials, there is no allegation that *Biogen* had anything to do

---

[12] The same congressional report notes that the internal review found that "the interactions were consistent with the agency's public health mission given the potential for the first disease modifying drug for Alzheimer's disease." House Staff Report 16.

with that decision.  In any event, the congressional report has not changed the end result: aducanumab remains approved by the FDA under its accelerated approval pathway.

Plaintiffs also argue that defendants "must have known" contrary facts based on the portion of Sandrock's statement that "our data are all consistent with that." Br. 50.[13]  This statement does not mean that Sandrock (or any other defendant) was aware of the countervailing analyses relied on by plaintiffs. And mere allegations that defendants "monitored" a certain aspect of the business are inadequate absent particularized facts that defendants actually possessed contradictory information.  *See Cox* v. *Blackberry Ltd.*, 660 Fed. Appx. 23, 25 (2d Cir. 2016) (summary order).  Even if plaintiffs pleaded facts suggesting that defendants were aware of Massie's competing subgroup analyses (which they have not),[14] plaintiffs do not plead that defendants endorsed Massie's analyses and *disbelieved* their publicly stated opinions.

---

[13] Plaintiffs also point to a statement that Defendant Budd Haeberlein had "looked very closely at the baseline demographics and characteristics" of patients in the two studies, Br. 50 (citing A127 ¶ 238), but her awareness of patient "demographics and characteristics" is irrelevant to scienter.  *See supra* n.5.

[14] Plaintiffs impermissibly rely on the congressional report for its truth to suggest that Biogen was aware of Massie's analyses.  *See* Br. 50.  But the extra-record congressional report does not say that.  It only notes that unspecified "reservations" about aducanumab's efficacy were conveyed to unspecified Biogen personnel at unspecified meetings over a year before the joint briefing

Plaintiffs' cases are not on point.  Unlike here, in those cases the defendant caused the violation of a legal duty or standard.  *See Aldridge* v. *A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002); *Singer* v. *Reali*, 883 F.3d 425 (4th Cir. 2018).  Here, there are no well-pleaded allegations that Biogen purposefully influenced the FDA to do anything improper and engaged in securities fraud.  Moreover, plaintiffs ask this Court to accept the inference that Biogen convinced the FDA's entire regulatory apparatus to approve a drug that it believed did not work and issue misleading statements to the public based solely on Sandrock and Dunn's interaction.  That inference is highly unreasonable when juxtaposed with the competing inference that Biogen believed in its drug and the FDA and Biogen collaborated to determine whether a treatment for Alzheimer's should be approved.

*Fourth*, plaintiffs argue that the drug was "critical to Biogen's financial success," which gives rise to an inference of scienter.  Br. 49-50.  Plaintiffs

---

book was published.  House Staff Report at 20 n.80.  That certain FDA employees raised questions about aducanumab's efficacy during the period of study is unsurprising—that is the FDA's job.  But the congressional report does not say that the allegedly "concealed" analyses performed by Massie were conveyed to any individual defendant, much less caused them to change their own interpretation of the data.

plead no facts supporting this allegation.[15]  This Court has also squarely rejected this theory of scienter.  In *Brennan* v. *Zafgen, Inc.*, the plaintiff alleged that "all the company's hopes  .  .  .  hinged on [the developmental drug's] success," and thus that the defendants "had a motive to 'shade the truth'" about clinical study results.  853 F.3d 606, 616 (2017).  This Court reasoned that such allegations were no different from "the usual concern by executives to improve financial results" and thus "do not satisfy the PSLRA without something more."  *Id.* (citation and internal quotation marks omitted).  This Court also concluded that similar scienter allegations "clearly fall short" in *In re Biogen Inc. Securities Litigation*, where the alleged false and misleading statements concerned a different drug that, unlike aducanumab, accounted for approximately one-third of the company's revenue at the time.  857 F.3d at 44.

## IV.   PLAINTIFFS DO NOT PLEAD LOSS CAUSATION

The district court correctly dismissed the complaint for the independent reason that it "fails to sufficiently allege a corrective disclosure that connects" the negative news accompanying Biogen's stock drop to any "earlier false or misleading statement."  Add. 40.  "To prove loss causation, a plaintiff must show a sufficient connection between the fraudulent conduct and the losses suffered."  *Bricklayers and Trowel Trades International Pension Fund* v.

---

[15] In fact, before aducanumab was approved, Biogen publicly reported more than $11 billion in annual product revenue and nearly $6 billion in annual net income for 2019.  A707.

*Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014) (internal quotation marks, citations, and alterations omitted).

In this case, Biogen's stock price dropped on November 9, 2020, the first trading day following the advisory committee's votes on November 6.  A60 ¶ 19, A142 ¶ 280.  Plaintiffs allege that the release of the Massie report on *the morning of November 4* was a corrective disclosure because it "revealed the truth" about defendants' purported misstatements.  Br. 51.  But the Massie report was published as part of the joint briefing book *two days* before the advisory committee vote, and Biogen stock *increased* by 39% on the day that both the joint briefing book and Massie report were published.  A457-466. Plaintiffs insist that the market took several days to react to the Massie report because it was "highly technical" and "buried."  Br. 53.  But the theory that the market *instantly* digested the scientific discussion in the first 250 pages of the joint briefing book, but somehow took several days to react to the scientific discussion in the simultaneously released 97-page Massie report, defies common sense.  It also ignores the allegations in the complaint.  Plaintiffs allege that analysts read, understood, and reacted to the Massie report shortly after its publication and before the advisory committee vote, including the very analyses plaintiffs put at issue here.  *See* A140 ¶ 277(a) (analyst report on November 4 discussing Massie's analyses of non-carriers); A140-141 ¶ 277(b) (analyst report on November 5 discussing Massie's correlation analyses).  Plaintiffs

54

also do not dispute that the Massie report included an "Executive Summary" and "Conclusions and Recommendations," both of which plainly and succinctly state Massie's conclusions with respect to the same issues.  *See* A204-207 (noting that "the totality of the data does not seem to support the efficacy of the high dose" and that Massie "believes there is no compelling substantial evidence of treatment effect or disease slowing.").

Plaintiffs cite no case sustaining loss causation allegations premised on the novel theory that the market processed positive news several days faster than negative news in a single disclosure.  In *In re Xcelera.com Securities Litigation*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (emphasis added), this Court endorsed plaintiffs' statistical price impact analysis at the class certification stage specifically because, regardless of number of days viewed as part of that analysis, it "capture[d] the *same-day reaction* of Xcelera's stock price to company-specific events."  And *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 266 n.33 (5th Cir. 2009) concerned a completely different situation in which a price increase in the middle of a "series of disclosures" did not preclude loss causation because the issuer's stock dropped "after the last disclosure in the series."

Plaintiffs also argue that the advisory committee vote on November 6 was a corrective disclosure.  Br. 54-55.  But the only new information conveyed to the market by those votes was the *outcome* of the votes.  The complaint alleges no misstatement that was corrected by this new information—nor

could it, as defendants never predicted how the advisory committee would vote, cautioned that the FDA's approval was uncertain, *see, e.g.*, A651, and expressly declined to "speculate on how the regulators would look at this kind of data" or to "comment on FDA's internal processes." A614, A639. The failure to establish any connection between the advisory committee votes on November 6 and any prior alleged misstatement is fatal to the pleading of loss causation. *See Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 813 (2011). Plaintiffs' "materialization of the risk" theory, Br. 55-56, fails for the same reason: the risks involved in the FDA approval process were disclosed.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Audra J. Soloway

WILLIAM J. TRACH
LATHAM & WATKINS LLP
*200 Clarendon Street*
*Boston, MA 02116*

AUDRA J. SOLOWAY
DANIEL S. SINNREICH
DANIELLE J. MARRYSHOW
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*(212) 373-3000*
*asoloway@paulweiss.com*

MARCH 15, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Audra J. Soloway, counsel for appellees and a member of the Bar of this

Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that

the attached Brief of Appellees is proportionally spaced, has a typeface of 14

points or more, and contains 12,961 words.


/s/ Audra J. Soloway
AUDRA J. SOLOWAY

MARCH 15, 2023

## CERTIFICATE OF SERVICE

I, Audra J. Soloway, counsel for appellees and a member of the Bar of this Court, certify that, on March 15, 2023, the attached Brief of Appellees was filed with the Clerk of the Court through the electronic-filing system. I further certify that all parties required to be served have been served.

/s/ Audra J. Soloway
AUDRA J. SOLOWAY